ARMSTRONG, Judge.
In 1972 plaintiffs filed suit against defendant seeking a judicial determination of the boundary line between the contiguous estates owned by plaintiffs and defendant. In support of this action the plaintiffs submitted a survey prepared in 1971 by Thomas Reed at their request. In 1974 the trial court appointed Hugh McCurdy to survey the property in question.
In 1977 plaintiffs filed a supplemental and amending petition requesting a complete accounting of all income and benefits received by defendant from the property and, furthermore, alleging plaintiffs’ entitlement thereto.
Trial was commenced on August 26,1981 and, after several lengthy recesses, was completed in February, 1983. In its judgment the trial court ordered that the boundary line between plaintiffs’ and defendant’s properties be fixed as the line shown on the survey made by Thomas Reed in 1971. The court further ordered that the plaintiffs’ action for revenues received by defendant from the rental of boat sheds on the property be dismissed. The court gave plaintiffs 30 days to exercise their option under LSA-C.C. art. 497 to either retain the constructions made by defendant or have them demolished at defendant’s expense. Finally, the court ordered that each party pay its own costs and one-half of Hugh McCurdy’s survey costs. All parties have appealed the trial court’s rulings.
The focus of this litigation is a canal which, according to recent surveys, is located on the properties of both plaintiffs and defendant. The property in question is located in Plaquemines Parish near the western bank of the Mississippi River. The plaintiffs own property which is contiguous and up-river to the defendant’s property.
The record reflects that in November 1921 Joseph Hingle, plaintiffs’ ancestors in title, sold the property in question to Empire Canal and Fisheries (“Empire”). This sale was made without reference to a sur *932 vey and contained the following property description:
... [A] certain tract of Land situated in the Parish of Plaquemines, State of Louisiana, about 55 miles below the City of New Orleans — on the right bank of the Mississippi River — Having and measuring (200) Two hundred feet width and extending from the New Orleans & Lower Coast R. R. Co. Track to Bay Adam— Bounded on the lower side by lands of A. L. Juricich [sic] and on the upper side by lands of the Vendor Joseph Hingle....
Prior to this act of sale Hingle dredged a canal which extended from a point near the railroad tracks to Bay Adams, but the property description in the act of sale contained no reference to the canal.
Following a series of transactions, the property was purchased by Edward F. Le-breton, at a sheriffs sale, in July 1928. Included in the property description in the July 1928 sale was a reference to the “Canal thereon.”
In November 1928, Lebreton sold four tracts of land, including the property in question, to defendant’s ancestor in title, Arthur Battistella. The property here at issue was described as follows:
A certain tract of land, together with all the buildings and improvements thereon, and all ways, rights, privileges, servi-tudes and advantages thereunto belonging, or in anywise appertaining, situated in the parish of Plaquemines, State of Louisiana, about fifty five miles below the city of New Orleans, on the right bank of the Mississippi river, having and measuring two hundred feet in width and extending from the New Orleans & Lower Coast Railroad Co. track to Bay Adam, bounded on the lower side by lands of A.L. Juricich [sic] and on the upper side by lands of Joseph Hingle.
Thus, defendant’s ancestor in title purchased the property without reference to the canal. Moreover, each act of sale from the 1921 sale by Hingle to Empire up to and including the sale from Lebreton to Battistella was made without reference to a survey.
In September 1929 Battistella had the property surveyed by R.P. Rordam. Ror-dam’s survey portrayed the canal as lying entirely on Battistella’s property and approximately centered on the property. More specifically, Rordam portrayed Bat-tistella’s upper property line as being parallel to and eighty feet above the upper bank of the canal and the lower property line as parallel to and eighty feet below the lower bank. In preparing the survey, however, Rordam did not specifically survey the Bay Adams half of the upper bank of the canal and had not used generally accepted surveying procedures.
In May 1930 Battistella sold to C.B. Foster Packing Co. a tract of land which included virtually all of the upper bank of the canal but reserved to Battistella the title to the bottom of the canal. In connection with this sale, Battistella, C.B. Foster and John Pottharst, individually and as president of the Peoples Utilities Co., Inc., entered into a boundary settlement which set out the limits of the respective parties’ properties. Hingle was not a party to the boundary agreement but he did sign the document as an intervenor for the limited purpose of granting a right of passage across property he owned at the Mississippi River end, or closed end, of the canal. Both the sale and boundary settlement of 1930 referred to the Rordam survey of 1929.
Upon Arthur Battistella’s death, his widow, Rose Bilson, and his son Louis, defendant herein, were placed in possession of the property. The judgment of possession was recorded on October 30, 1945. On October 31, 1945, Rose Bilson sold her undivided one-half interest in the property to Louis Battistella.
In 1960 and 1962, Louis Battistella had portions of the property adjoining the canal surveyed by Horace Black. In connection with these surveys, Battistella or his representative advised Black that his property was 250 feet in width, a representation clearly in conflict with the property description. Black’s April 1962 survey, based *933 upon a width of 250 feet, revealed that Battistella’s upper property line actually intersected the upper bank of the canal. This is to say that in contrast to the Ror-dam survey which depicted Battistella’s upper property line as being eighty feet above the upper bank of the canal throughout the entire length of the canal, the Black survey portrayed the upper boundary as intersecting with the canal. There is no indication from the record, however, that Battistella took any steps to either ascertain which survey was accurate or correct the error in either survey.
Although the exact date is not clear, Battistella began constructing boat sheds on the upper bank of the canal sometime in 1962. Battistella testified that construction began in 1960 but both Black’s survey and Battistella’s tax records indicate that the sheds were not built until some time in 1962.
In 1971 Thomas P. Reed surveyed the area in question for plaintiffs. Reed’s survey portrayed defendant’s upper boundary as traversing the canal so as to eliminate the mouth of the canal and a major portion of the upper bank from defendant’s ownership. The result of such configuration was to place the boat sheds almost entirely on plaintiffs’ property and leave defendant with a dead-end canal and no water access to either Bay Adams or the Mississippi River. Upon receipt of the Reed survey, plaintiffs met with defendant on two occasions to discuss their mutual boundary line. Plaintiffs instituted the instant boundary action on May 18, 1972.
In 1974 the trial court appointed Hugh B. McCurdy to survey the property in connection with the instant litigation. McCurdy’s survey portrayed boundaries similar to those of the Reed survey. Both the Reed and McCurdy surveys were in direct conflict with the Rordam survey of 1929.
It is clear from the record that Rordam’s survey was erroneous and can not form the basis of defendant’s claim of ownership to the disputed property. At trial, Louis Bat-tistella testified that Rordam had not actually surveyed the property all the way to Bay Adams as that end of the property was not worth enough to justify a completé survey. McCurdy testified that Rordam’s field notés indicated that Rordam had merely projected the upper boundary line to Bay Adams.
McCurdy and Horace Black testified that Rordam had not used accepted surveying principles in preparing the survey as he failed to set out coordinates of points and bearings. Additionally, McCurdy testified that in contrast to Reed, Black and himself, Rordam did not place Battistella’s upper property line parallel to his lower property line; rather, Rordam placed Battistella’s upper property line parallel to Hingle’s upper property line.
McCurdy further testified that he could find no basis in either the titles involved or Rordam’s field notes for Rordam’s depiction of Battistella’s upper property line as being parallel to and eighty feet above the upper bank of the canal.
Under such circumstances it is clear that the Rordam survey did not sufficiently meet the requirements of quality so that this court can rely on it in adjudicating the differences between the parties. McMichael v. Williams, 111 So.2d 542 (La.App. 1st Cir.1959). The defendant does not seriously argue to the contrary.
The defendant does argue, however, that the series of sales and leases following Arthur Battistella’s purchase in 1928 and extending up to the institution of this action demonstrates that the parties to the 1928 sale intended for the entire canal and its upper bank to be included in what is now defendant’s property. Defendant further argues that it is illogical to assume that the parties would have intentionally transferred the property so as to leave Arthur Battistella with a dead-end canal. Defendant, therefore, alleges that the 1928 act of sale was ambiguous and not the depository of the intentions of the parties and that, as a result, parol evidence is admissible to show the true intent of the parties.
*934 It is well settled that as a general rule parol evidence is not admissible to alter the terms of a written agreement. LSA-C.C. art. 2276. Parol evidence is admissible, however, “to establish a clerical error, almost patent in the description of land contained in the deed, as also to explain lurking ambiguities, to identify the property, to prove fraud practiced in the transfer of land, to show possession, to show boundaries ...” Levy v. Ward, 33 La.Ann. 1033, 1035 (1881); See Brulatour v. Teche Sugar Co., 209 La. 717, 25 So.2d 444 (1946). It is aximomatic that courts should endeavor to give effect to the intent of the parties. LSA-C.C. art. 1945.
“It is true that, in the execution of deeds and like instruments, the intentions of the parties must be gathered from inspection of the instrument without the aid of extrinsic evidence, if their intentions can be thus ascertained, but, if an instrument is so ambiguous as to leave the mind in doubt as to what the parties intended, extrinsic evidence may be resorted to as an aid in construction ...” Plaquemines Oil and Development Co. v. State, 208 La. 425, 23 So.2d 171, 174 (1945).
In the instant case the pertinent property description contained in each act of sale from 1921 to the present has been as follows:
... [a] certain tract of Land situated in the Parish of Plaquemines, State of Louisiana, about 55 miles below the City of New Orleans — on the right bank of the Mississippi River — having and measuring (200) Two hundred feet width and extending from the New Orleans & Lower Coast R. R. Co. A. L. Juricich [sic] and on the upper side by lands of the Vendor Joseph Hingle ... (emphasis added).
This property description is clear and unambiguous and contains no apparent contradictions which would raise a question as to the true intent of the parties. Neither the original act of sale in 1921 nor the sale in 1928 were made in connection with or based upon a survey. There is, therefore, no conflict between the property description and an incorporated map or survey. The only apparent conflict which would raise an issue as to intent is that existing between the property description contained in the 1921 and 1928 acts of sale and the Rordam survey of 1929 which, as was discussed above, was not made pursuant to acceptable surveying procedures. Such conflict does not justify the admission of extrinsic evidence for the purpose of interpreting an otherwise clear and unambiguous title.
We likewise do not believe that the mere fact that defendant is left with a dead-end canal justifies the introduction of extrinsic evidence. The record is clear that all of Arthur Battistella’s business operations were conducted on the Mississippi River end of the canal and that he was so unconcerned with the other end of the canal that he did not deem it worth surveying. In fact, no business operations were conducted by the Battistellas on the Bay Adams half of the upper bank of the canal until approximately 17 years after Louis Battistella had taken possession of his father’s property. The defense has simply failed to make a sufficient showing that the 1928 act of sale was not the depository of the parties’ intentions so as to justify our consideration of extrinsic evidence. Accordingly, we decline to consider extrinsic evidence for the purpose of interpreting the acts of sale in question.
The defense next argues that in signing the 1930 boundary settlement, Hin-gle agreed to the boundary line established by Rordam as well as Battistella’s ownership of the canal. The 1930 boundary settlement purported to establish the boundary lines of the properties belonging to Arthur Battistella, C.B. Foster and Peoples Utilities Co., Inc. Joseph Hingle signed the document as an intervenor but only for the limited purpose of granting a right of passage on his property. The record does not disclose why Hingle chose not to join in the boundary agreement. The defense nevertheless asserts that by signing the boundary settlement, Hingle was bound by the provisions contained therein. We disagree.
*935 Hingle was not a party to the boundary settlement; rather, he was a party only to an agreement granting a right of passage in favor of Arthur Battistella, C.B. Foster and Peoples Utilities Co., Inc. His signature was placed on the document for a limited and specified purpose which we will not extend, especially considering that the survey upon which the boundary agreement was based was erroneous. See Pan American Production Co. v. Robichaux, 200 La. 666, 8 So.2d 635 (1942).
The defense next argues that it has acquired title to the property via ten years acquisitive prescription. In order to acquire title to immovables through ten years acquisitive prescription, the defendant must show that he has had possession of the property for ten years under just title and in good faith. LSA-C.C. art. 3479 (1870). Possession must have been continuous and uninterrupted, peaceable, public and unequivocal. LSA-C.C. art. 3487 (1870).
The term “just title” refers to a legal and transferable title of ownership, LSA-C.C. arts. 3483-4 (1870), and includes “a title which the possessor may have received from any person whom he honestly believed to be the real owner, provided the title were such as to transfer the ownership of the property.” Barrios v. Legendre, 127 So.2d 790, 796 (La.App. 4th Cir. 1961).
A person possesses in good faith if he has no knowledge of defects in his ownership. LSA-C.C. arts. 503, 3451 (1870); Barrios, supra; See Kees v. Louisiana Central Lumber Co., 183 La. 111, 162 So. 817 (1935). Good faith is presumed, and it is sufficient that possession begins in good faith even though the possessor later learns of defects in his title. LSA-C.C. arts. 3481, 3482 (1870).
To acquire property via ten years acquisitive prescription, it is sufficient that one have actual possession of only part of the property included in the title. LSA-C.C. art. 3498 (1870); Meraux & Nunez v. Gaidry, 171 La. 852, 132 So. 401 (1931); Vidrine v. Vidrine, 14 La.App. 484, 130 So. 244 (La.App. 1st Cir.1930); Compare LSA-C.C. art. 3503 (1870). One cannot, however, acquire property beyond title via ten years prescription. Johnson v. La Bokay Corp., 326 So.2d 589 (La.App. 3rd Cir. 1976); Carpenter v. Cobb, 293 So.2d 888 (La.App. 1st Cir.1974); Dunn v. Bayonne, 197 So. 284 (La.App. 2nd Cir.1940).
In the instant case defendant is attempting to acquire property beyond the limits of his title. The Reed survey clearly depicts the contested portions of the upper bank as being outside of defendant’s property limits as set forth in the property description. Defendant, however, cites the decision of Ledoux v. Waterbury, 292 So.2d 485 (La.1974) for the proposition that property can be acquired beyond title.
In Ledoux two brothers entered into an act of partition whereby the tract of land which they owned in indivisión was divided into two equal parcels, one to each brother. The partition was made in connection with a survey. Walter Ledoux was allotted the western parcel of property, and he erected a fence six feet west of the eastern boundary line of his property. Twenty-nine years and numerous transfers later, a survey was made in connection with a boundary action. The survey revealed that the original dividing line set up pursuant to the act of partition had been incorrectly placed and that the correct line was well to the west of the fence erected by Walter Le-doux. At issue in Ledoux was the ownership of the land lying between the fence and the line portrayed by the more recent survey.
In holding that the owners of the western parcel were owners up to the fence and, therefore, beyond the boundary line as established by the new survey, the Supreme Court held, “They have exercised the necessary possession of this land under color of title and in good faith for over ten years.” Ledoux at 487. It is important to note that although the court in Ledoux stated that “[pjarties who buy on the faith of the public records showing the limits of their estates as fixed by courses and dis *936 tances are entitled to keep what is there shown to be in the estate purchased by them”, the court did not base its decision on that legal principle. Ledoux, id. Rather, the court found that the defendants therein had satisfied the requirements of the code necessary to acquire property via ten years prescription. We find Ledoux to be distinguishable from the case at bar.
In the instant case, neither Arthur Battistella nor his son ever erected a visible marker or monument which clearly depicted the limits of their possession, and Louis Battistella has not demonstrated that he actually corporeally possessed the property in dispute for ten years. LSA-C.C. art. 3469 (1870). Although defendant testified that he constructed the boat sheds in 1960, he produced no documentation to support this claim. Furthermore, during cross-examination defendant testified that he may have been a little off on his dates. Finally, Black’s survey of April 1962 did not reflect the existence of any sheds on the upper bank.
We also feel that it is significant that Black’s 1962 survey which was based on a 250 foot width rather than the correct 200 foot width, clearly portrays defendant’s upper property line as intersecting the upper bank of the canal. This configuration unequivocally conflicts with Rordam’s survey and defendant’s belief that he owned an eighty foot wide strip on the upper bank along the entire length of the canal. The evidence reflects, therefore, that when defendant began his physical possession of the disputed property by erecting sheds, he had sufficient information to put him on notice of possible defects in his title, thereby rendering his possession to be in bad faith. Defendant has not satisfied the requirements of the code necessary to acquire property via prescription.
In reaching this conclusion we are not unmindful of the decision in Buras Ice Factory v. Dept. of Highways, 235 La. 158, 103 So.2d 74 (1958), which defendant maintains supports his argument that he was a good faith possessor of the property in question. The defendant did not raise the Buras decision at the trial court level.
In Buras the plaintiff owned and operated an ice factory located on the closed end of the Battistella Canal. Arthur Battistella granted the Louisiana Department of Highways a right of way over and through the closed end of the canal for the purpose of making highway improvements. In exercising its right of way the Department of Highways constructed a dirt embankment which prevented navigation to and from plaintiff's ice factory. Plaintiff sued the Department of Highways for damages alleging that the blocking of the canal rendered the ice factory a total loss and depreciated the value of the lot on which it was situated.
The decision in Buras, id. at 76, begins with the following statement: “As sole and absolute owner of the Battistella Canal situated in Plaquemines Parish one Louis Bat-tistella, on October 7,1947, granted in writing to the Department of Highways of the State of Louisiana a right of way ...” The Court in Buras, supra at 77, later states, “Our examination [of the record] reveals that in October 1929 Arthur Battis-tella owned the privately dredged Battistel-la Canal and all land under and immediately surrounding it ...” The defendant herein maintains that the above cited quotes support his claim that he was a bona fide possessor.
In Buras the court was concerned only with the closed end of the canal and not that portion of the canal and its banks herein at issue. Moreover, the parties in Buras were not the same as those now before this court. The above cited statements from Buras were dicta and, more importantly, were made prior to the surveys now before us which indicate that the Rordam survey was erroneous. It is clear, therefore, that the Buras decision cannot serve as a judicial declaration of title to the property herein at issue.
The Buras decision also does not represent grounds upon which defendant can rest his claim of good faith. Buras *937 pre-dated Black’s surveys of 1960 and 1962, as well as defendant’s physical possession of that portion of the property which lay beyond the scope of his title. Buras, therefore, does not alter our conclusion that defendant has failed to establish the good faith and possession necessary to acquire property via ten years acquisitive prescription.
Plaintiffs argue that as a bad faith possessor, defendant is liable for rent for his use of the property and for the rental income which he received from the boat sheds. Plaintiffs also seek an accounting of the rental income. The trial court denied plaintiffs’ request for rental income and an accounting but did allow them to exercise their option under LSA-C.C. art. 497 to either keep the works made by defendant and pay either the value of the materials and workmanship or the enhanced value of the land, or have the works demolished at defendant’s expense.
Plaintiffs instituted this boundary action in May 1972 and amended their petition in July 1977 requesting an accounting of defendant’s rental income from the boat sheds and alleging plaintiffs’ entitlement thereto. Article 497 was enacted in 1979 and should not, therefore, have been applied to the instant case. See Porterfield v. Spurgeon, 379 So.2d 56 (La.App. 3rd Cir.1979), writ denied, 381 So.2d 1235 (La.1980). The law, therefore, applicable to an owner’s right to recover from a possessor was LSA-C.C. art. 508 (1870), and it provided:
When plantations, constructions and works have been made by a third person, and with such person’s own materials, the owner of the soil has a right to keep them or to compel this person to take away or demolish the same.
If the owner requires the demolition of such works, they shall be demolished at the expense of the person who erected them, without any compensation; such person may even be sentenced to pay damages, if the case require it, for the prejudice which the owner of the soil may have sustained.
If the owner keeps the works, he owes to the owner of the materials nothing but the reimbursement of their value and of the price of workmanship, without any regard to the greater or less value which the soil may have acquired thereby.
Nevertheless, if the plantations, edifices or works have been made by a third person evicted, but not sentenced to make restitution of the fruits, because such person possessed bona fide, the owner shall not have a right to demand the demolition of the works, plantations or edifices, but he shall have his choice either to reimburse the value of the materials and the price of workmanship, or to reimburse a sum equal to the enhanced value of the soil.
LSA-C.C. art. 502 (1870), relative to a possessor’s rights to fruits, provided:
The products of the thing do not belong to the simple possessor, and must be returned with the thing to the owner who claims the same, unless the possessor held it bona fide.
For the reasons cited above, we do not believe that defendant was a bona fide possessor of the property in question. Accordingly, plaintiffs have the option of keeping the boat sheds and reimbursing defendant the value of the materials and the price of workmanship, or having the sheds demolished at defendant’s expense. LSA-C.C. art. 508 (1870); Voiers v. Atkins, 113 La. 303, 36 So. 974 (1903). Additionally, defendant is liable, upon a proper showing of value by plaintiffs, for rent and for the fruits he obtained by virtue of his adverse possession. LSA-C.C. art. 502 (1870); See Southwestern Gas & Electric Co. v. Nowlin, 164 La. 1044, 115 So. 140 (1927); Guinea Realty Co. v. Battle, 1 So.2d 153 (La.App. 2nd Cir.1941).
We do not believe, however, that plaintiffs have borne their burden of proving, for the period of time in question, either the value of the property improperly possessed or the rental value of the boat sheds. Plaintiffs failed to establish the amount of income defendant received from renting the sheds and failed to produce *938 evidence as to comparable property and rental values in the area in question. Accordingly, the trial court properly refused to grant plaintiffs’ request for rental income and for an accounting. Guinea, supra.
Finally, plaintiffs argue that they are entitled to a judgment assessing all costs against defendant. We agree.
It is well settled that the costs of fixing a boundary should ordinarily be at the joint expense of the parties. LSA-C.C. art. 663 (1870); Savoie v. Savoy, 262 So.2d 582 (La.App. 3rd Cir.1972); Thomas v. Louisiana Long Leaf Lumber Co., 113 So.2d 108 (La.App. 2nd Cir.1959). Exceptions to this general rule are when there is no justiciable dispute and when one party unreasonably refuses to amicably settle the dispute. William T. Burton Industries, Inc. v. Wellman, 343 So.2d 996 (La.1977); Thomas, supra. Under the facts of this case we believe that defendant unreasonably failed to amicably settle the boundary action. Accordingly, the trial court’s assessment of costs equally between the parties is reversed and all costs are to be taxed to defendant.
The trial court’s decision is affirmed except that the plaintiffs’ option relative to the works constructed by defendant should be exercised pursuant to LSA-C.C. art. 508 (1870) rather than LSA-C.C. art. 497, and all costs are to be assessed against defendant.
AFFIRMED IN PART REVERSED IN PART AND RENDERED.
ON REHEARING GRANTED
In our order granting rehearing we instructed the parties to direct their attention in briefs to whether or not there is sufficient evidence in the record to enable the court to assess damages in plaintiff’s favor for the fruits and/or revenues derived by defendants while possessing in bad faith, and, if not, whether the case should be remanded to allow plaintiff to produce evidence in support of his damage claim and to allow defendants to produce evidence of their expenses in maintaining, preserving, and operating the property as an offset against plaintiff’s claim.
In response, plaintiff has resisted a remand insisting that the evidence of record is sufficient to establish his claim and that defendants should not be given a second chance to prove their expenses having failed and neglected to do so originally.
The evidence plaintiff relied on to support his claim for $563,040 is some vague testimony on cross-examination of Louis Battistella that he rented the boat sheds on a month-to-month basis at thirty to fifty dollars per month and a large batch of ledger sheets produced by Battistella purporting to show some of his earnings from the sheds. From this plaintiff contends his claim can be “tabulated” by the court.
We are unable to make such a tabulation. Plaintiff had the opportunity to engage in pre-trial discovery and to employ expert assistance to analyze Battistel-la’s testimony and evidence and to present to the trial court a well-reasoned and considered estimate of Battistella’s revenues. The trial court is vested with much discretion to assess damages in cases where the sum is uncertain and is even provided by C.C.P. Art. 192 with the opportunity to appoint an expert to assist him with accounting problems such as this. The court of appeal is not in the same position. Its function is to review the conclusion of the trial court, not to make original calculations, estimates, interpolations or tabulations from vague testimony and a stack of ledger sheets.
After hearing the testimony and considering the ledger sheets the trial court concluded they were insufficient to prove any amount to which plaintiff was entitled. This conclusion is supported by the record.
Accordingly, we reinstate our original opinion.